*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| BOB S., | ) | |
| | ) | Supreme Court No. S-16504 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-00014 CN |
| v. | ) | |
| | ) | |
| STATE OF ALASKA, | ) | O P I N I O N |
| DEPARTMENT OF HEALTH & | ) | |
| SOCIAL SERVICES, OFFICE OF | ) | No. 7186 – July 28, 2017 |
| CHILDREN'S SERVICES, | ) | |
| | ) | |
| Appellee. | ) | |
| _____ | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: J. Adam Bartlett, Anchorage, for Appellant. Aisha Tinker Bray, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee. Anita L. Alves, Assistant Public Advocate, and Richard K. Allen, Public Advocate, Anchorage, Guardian Ad Litem.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

BOLGER, Justice.

## I. INTRODUCTION

A father appeals the superior court's order terminating his parental rights to a daughter with sexualized and aggressive behavior, arguing that he substantially

remedied his prior misconduct by completing outpatient treatment programs and that the Office of Children's Services (OCS) violated its obligation to provide active efforts to reunify the family by discontinuing his visitation after his daughter returned from an out-of-state treatment program. But the superior court reasonably concluded that the visitation was not in the child's best interest, that the father had failed to comply with substance abuse testing and delayed a critical sex offender risk assessment, and that it would cause serious emotional damage to return the child to his home. We therefore affirm the court's order terminating his parental rights.

## II.    FACTS AND PROCEEDINGS

### A.    Background

Bob S. is the father of Tonya, now ten.[1] Tonya is an Indian child as defined by the Indian Child Welfare Act (ICWA) based on her mother's affiliation with the Native Village of Selawik.[2]

Tonya was exposed to domestic violence at a very early age. She lived with her parents and her mother's two young sons, and the parents' relationship was abusive. In 2009 Bob ended the relationship and moved into his own housing after serving time for domestic violence against the mother. The following year, three-year-old Tonya moved in with Bob because her mother could no longer care for her.

Bob enrolled Tonya in preschool in 2011. Her behavioral issues appeared quickly. Tonya was hypersexualized and physically violent; she was also defiant, and she made a teacher's aide cry. She was kicked out of preschool and moved to another

---

    [1]    We use pseudonyms to protect the privacy of the parties.

    [2]    *See* 25 U.S.C. § 1903(4) (2012). Tonya's mother relinquished her parental rights shortly before trial.

program. She was referred to services and given daily school monitoring and weekly counseling. But her sexualized and aggressive behavior continued.

Tonya later disclosed that her brothers had molested her when she lived with her mother. Tonya's sexual reactivity was further exacerbated by living with her father. Their apartment had only one room, and Bob had sexual relations with others in front of Tonya. Bob maintained that he thought Tonya was asleep, but he later took responsibility and apologized when Tonya brought the issue up repeatedly during family therapy sessions.

### B. Initial OCS Involvement And Treatment

In September 2012 OCS investigated a report of harm based on Tonya's sexualized behavior at school. OCS's involvement quickly escalated. In January 2013 OCS took custody of Tonya after Bob left her with a neighbor and disappeared. He later admitted that he had used crack cocaine that evening and had continued to use until he resurfaced in April 2013. OCS placed Tonya at a residential treatment center in Oregon because in-state providers could not treat her extreme behaviorial issues.

Tonya stayed at the center from March 2013 to December 2014. Both Tonya and eventually Bob made progress in their treatment during this period. Tonya worked with therapist Kiva Michels to address her rudeness, defiance, "poor boundaries," sexualized behavior, and reactivity to child abuse trauma. She was eventually able to demonstrate long periods of time with no sexualized behavior and no aggression.

Bob completed the Father's Journey parenting course and intensive outpatient substance abuse treatment. He also completed urinalysis tests (UAs), moved into a two-bedroom apartment, and sought support from his Father's Journey case manager outside of class. After he relapsed on cocaine partway through his treatment program, Bob completed an additional therapy program as requested by OCS. He

attended weekly family therapy sessions via Skype, flew to Oregon for quarterly visits, and spoke with Tonya on the phone.

During the family sessions, Tonya was able to openly discuss her father's behaviors that made her angry or anxious, and Bob was able to openly discuss his treatment progress and relapse. After observing them and establishing from Tonya that Bob had never sexually touched her, Michels allowed unsupervised visits and overnights at the center. But Michels was concerned about Bob's ability to supervise Tonya outside of a controlled environment. In August 2014 Michels brought Tonya to Anchorage to visit Bob and noted several instances where Bob missed a supervision issue. Tonya was triggered into sexualized posturing by being around some of the other neighborhood children, and twice Tonya and the other children were alone in her room with the door shut.

Tonya also had difficulty trusting Bob. Tonya had frightening memories from when her parents were together, and she seemed to worry that Bob's behavioral changes were not permanent or that he might abandon her again if he found a girlfriend. OCS also became concerned that Bob had started a relationship with a woman with extreme anger issues and alcoholism who posed a high risk to children. OCS warned Bob against having unsafe people in his home, but Bob continued to contact her.[3]

## C. Return To Alaska

Tonya returned to Alaska in December 2014. OCS placed her with a therapeutic foster parent and granted Bob unsupervised visitation twice a week and on four holidays. The transition went poorly.

---

[3]  Bob and the woman had a son together in November 2015. They were no longer involved by April 2016.

Tonya's behavior quickly escalated, and she made alarming statements about the visits. She engaged in sexual and aggressive behavior around other children and teachers, such as inappropriate touching, grinding, and sexual remarks. She "pretend[ed] to . . . pimp[] out her friends," and she was assaultive on the school bus. Tonya made excuses not to visit Bob and disclosed that Bob left her in her room with another child unsupervised, that "things needed to be secret and kept in the family," that Bob had people at the house who were not supposed to be there, and that Bob was having parties.

In late January Tonya began to see Tracie Weeks for weekly cognitive behaviorial therapy. Weeks also supervised two family therapy sessions with Bob and Tonya before reporting that the family sessions weren't going well and recommending that OCS terminate Bob's visitation. Bob's final unsupervised visit was in February. OCS supervised two more visits and then cut off all contact based on Weeks's recommendation and other concerns. Based on Tonya's disclosures, OCS substantiated sexual abuse centered around Bob exposing her to pornography.

OCS considered returning Tonya to the Oregon treatment center, but her behavior improved and she stayed in Alaska. Tonya's behaviorial issues escalated later when the FBI began meeting with her as part of an investigation into possible human trafficking by Bob, but ceased after the investigation ended.[4] By summer Tonya was able to attend a normal summer camp without supervision. OCS case worker Heather Rough spoke with Bob about completing a sex offender risk assessment, and she grew concerned that he might have resumed using drugs when she could not contact him to schedule it. In June 2015 OCS changed the permanency plan to adoption.

---

[4] Charges were never filed.

## D.    Visitation Hearing

That summer the court held a three-day hearing on OCS's denial of visitation pursuant to Child in Need of Aid (CINA) Rule 19.1(a).[5]  The court heard testimony from Michels, Weeks, Rough, and two other witnesses and in October 2015 denied Bob's motion for visitation.

Michels explained that Tonya used her behavior as her language, and her behavior signaled that she did not feel safe.  Although Tonya and Bob had a clear bond, Tonya still had trust issues with Bob, and Tonya didn't feel safe when she was left alone with Bob without anybody close by.  Michels thought that Tonya's behavior might be related to the visits, not necessarily because anything bad was happening, but because Tonya had ongoing anxiety about being with her dad.  Michels thought it would be a "devastating setback" for Tonya if she had to be hospitalized again, as Tonya would think that she had failed.

Weeks was qualified as "a[n] expert in counseling with children and trauma victims" over Bob's objection to her credentials.  Weeks disagreed that there was a "strong bond" between Bob and Tonya and testified that Tonya did not express any deep emotion about missing Bob.  Based on Tonya's statements and Bob's alleged sexual abuse, Weeks thought that Tonya's safety was in question until the FBI investigation was complete.  She explained that Tonya could be triggered just by Bob's presence.

Rough explained that OCS's decision to terminate visitation was not necessarily permanent, but she saw the "drastic difference in [Tonya's] behaviors after

---

[5]    "[A] parent . . . who has been denied visitation . . . may move the court for a review hearing at which the Department must show by clear and convincing evidence that visits are not in the child's best interests."  CINA Rule 19.1(a).

the visitation stopped." Still, OCS was making efforts towards reunification by working on the sex offender assessment and substance abuse concerns.

Pursuant to CINA Rule 19.1(a), the superior court found that OCS proved, by clear and convincing evidence, that contact with Bob was not in Tonya's best interests. The court explained that it "does not make this finding lightly," but it could not ignore Tonya's extreme behavior and its correlation with Bob's visitation. It was "remarkabl[e]" that after six months of no contact, Tonya was able to attend summer camp without supervision. The court thought there was no doubt that Bob and Tonya loved each other, and "[a]t some point, contact will likely resume." But Weeks would be the best person to make that recommendation.

### E. Termination Trial

Contact never resumed. Tonya asked her treatment team what was going on and why had the visits stopped, but the FBI instructed them not to discuss Bob with her, and she eventually stopped asking about her father. Meanwhile, Bob made little progress on his case plan. He was noncompliant with UAs. He started the sex offender risk assessment paperwork in November 2015 and did not complete it until April 2016. The evaluator concluded that sex offender treatment was not likely to be beneficial for Bob, as he was in denial about any problematic sexual behaviors and was unlikely to engage in treatment.

The court held a termination trial in the summer of 2016. OCS presented eight witnesses, including Weeks. Bob testified on his own behalf and presented three other witnesses. Tonya's foster parent and Bob's sister both testified that they were willing to adopt Tonya.

Bob again objected to Weeks's credentials, but she was qualified as "an expert in . . . clinical . . . and psychological treatment for children suffering from traumatic conditions." Weeks, who was the only expert witness who testified, explained

that Tonya was triggered by other students who engaged in attention-getting behavior and by discussion including the FBI interviews of her family and the sexual abuse allegations. Weeks maintained that Tonya should not have contact with Bob "because every time it's happened . . . it is a trigger for her. And . . . she's . . . in the best situation she could be in right now."

Bob testified that he was willing to follow all recommendations, even repeating services he had already completed. He wanted to have contact with Tonya, even if he had to start over with just postcards. But the court ordered the termination of his parental rights.

A court must make five findings before terminating parental rights to an Indian child.[6] The court must find by clear and convincing evidence that (1) the child has been subjected to the conditions in AS 47.10.011;[7] (2) the parent has not remedied the harmful conduct;[8] and (3) OCS has made active but unsuccessful efforts to prevent the breakup of the Indian family.[9] The court must find by evidence beyond a reasonable doubt supported by qualified expert testimony that (4) the parent's continued custody of

---

[6] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009).

[7] AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[8] AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i).

[9] 25 U.S.C. § 1912(d); CINA Rule 18(c)(2)(B).

the child is likely to result in serious damage to the child.[10]  The court must find by a preponderance of the evidence that (5) termination of parental rights is in the child's best interests.[11]

The superior court found that Tonya was subjected to the conditions in AS 47.10.011 under subsections (1) and (3) (abandonment), (7) (sexual abuse), (8) (domestic violence), (9) (neglect), and (10) (substance abuse).  The court made the other four requisite findings and provided factual findings for support.

Bob appeals.  He does not dispute that Tonya was subjected to the conditions in AS 47.10.011, but he challenges each of the other findings.

## III.   STANDARD OF REVIEW

We review the superior court's decision to admit expert testimony for abuse of discretion.[12]  We review the superior court's factual findings for clear error.[13]  Factual findings are clearly erroneous "when a review of the entire record leaves us 'with a definite and firm conviction that the superior court has made a mistake.' "[14]  "Thus, 'we

---

[10]    25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

[11]    CINA Rule 18(c)(3); *see also* AS 47.10.088(c).

[12]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013) (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1253 (Alaska 2010)).

[13]    *Id.* at 961 (citing *Lucy J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 244 P.3d 1099, 1111 (Alaska 2010)).

[14]    *David S. v. State, Dep't of Health & Soc. Servs.*, 270 P.3d 767, 774 (Alaska 2012) (quoting *S.H. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 42 P.3d 1119, 1122 (Alaska 2002)).

will ordinarily not overturn a superior court's findings based on conflicting evidence.' "[15] We review de novo the court's conclusions of law, such as whether the superior court's findings and the expert testimony presented at trial satisfy the requirements of ICWA.[16]

## IV. DISCUSSION

### A. Whether Bob Remedied His Harmful Conduct

"Before a court may terminate parental rights, it must find by clear and convincing evidence that the parent has failed to remedy the harmful conduct or conditions."[17]

Bob argues that he remedied his harmful conduct, but he points only to conflicting evidence. Bob argues that Tonya's abandonment stemmed from his substance abuse, and that he remedied both issues when he completed his treatment program. He argues that Tonya's sexual abuse was remedied by removing her from her mother's home where the abuse occurred, and that he resolved other parenting issues by completing the Father's Journey course.

But the court noted Bob's long history of drug use, his relapse, the OCS case plans requiring him to comply with substance abuse testing and demonstrate sobriety even after he completed treatment, his testimony that he stopped working with OCS after visitation was denied, his documented noncompliance with UAs, and OCS's notice that no-shows were considered positive results. Based on his history, OCS was concerned that he had resumed using drugs when he fell out of contact.

---

[15]   *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009) (quoting *Brynna B. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 88 P.3d 527, 529 (Alaska 2004)).

[16]   *Thea G.*, 291 P.3d at 961-62.

[17]   *Jon S. v. State, Dep't of Health & Soc Servs., Office of Children's Servs*, 212 P.3d 756, 762 (Alaska 2009) (citing AS 47.10.088(a)(2)).

The court noted Tonya's reports about the visits, her negative reaction to the visits, and her escalating sexualized behavior, as well as Bob's long delay in completing the sex offender risk assessment and the conclusion that sex offender treatment was not likely to be beneficial due to Bob's denial about his problematic sexual behaviors. The court cited testimony from Michels that she was concerned about Bob's ability to supervise Tonya due to the lapses she observed during the August 2014 trip, which occurred after Bob completed his parenting classes. The court also noted Bob's poor decision to stay in a relationship with a dangerous woman despite OCS's warning that the relationship was not in Tonya's best interests.

These findings were all supported by the record, and we conclude that the court did not err in finding that Bob had not remedied his harmful conduct.

## B. Whether OCS Made Active But Unsuccessful Efforts To Reunify The Indian Family

Before terminating a parent's rights to an Indian child, the court must find by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[18] Bob argues that rather than making active efforts, OCS actively frustrated efforts by ending all contact between Bob and Tonya, frustrating his engagement in services and severing their parent-child bond. He challenges OCS's justification that Tonya was triggered by his contact, arguing that her escalating behavior was "caused by a complex set of factors" and pointing out that OCS made efforts to minimize the harm from the FBI interviews even though Tonya was also triggered by them. He also challenges OCS's deference to the FBI's instruction not to discuss Bob with her.

---

[18]     25 U.S.C. § 1912(d); *Jon S.,* 212 P.3d at 760-61.

### 1.    Denial of visitation

The superior court upheld OCS's denial of visitation in 2015. OCS is normally required to provide "reasonable visitation" if a child is removed from the parental home.[19] But OCS can deny visitation based on clear and convincing evidence that the visits are not in the child's best interests.[20] A parent can request a hearing to challenge OCS's denial of visitation.[21]

After a three-day hearing, the superior court found that OCS had proven that the visits were not in Tonya's best interests. Bob does not directly challenge that finding in this appeal, but his active efforts argument turns largely on OCS's decision to end visitation. We therefore explain why the record supports the superior court's 2015 determination that visitation was not in Tonya's best interests.

Tonya was born into a violent household, molested by her brothers, and exposed to her father's sexual activity. At age six, Tonya's sexualized and aggressive behaviorial issues were so severe that she was sent to an out-of-state treatment center for nearly two years because in-state providers could not help her. Upon her return, Tonya's behaviorial issues resumed with such severity that OCS considered sending her out of state again for treatment. Michels, who testified that Tonya would think she had failed if she were to be hospitalized again, thought that Tonya's behavior could be related to her anxiety about being with her father. Weeks, who testified that Tonya did not express any deep emotion about missing her father, explained that Tonya was triggered by Bob's presence. After OCS terminated her contact with Bob, Tonya's behavior improved to the point that she could attend a normal summer camp unsupervised. And at the time of

---

[19]    AS 47.10.080(p).

[20]    *Id*. CINA Rule 19.1(a).

[21]    CINA Rule 19.1(a).

the hearing, OCS had substantiated sexual abuse, the FBI was investigating Bob for possible human trafficking, and Bob had not followed through with a sex offender risk assessment.

The superior court understood that this finding was not to be made lightly. Alaska Statute 47.10.084(c) provides that a parent whose rights have not been terminated retains the residual "right and responsibility of reasonable visitation," and we have observed that a substantial impairment amounting to termination of this right "does not comport with [Title 47's] policy of preserving family ties."[22] The court noted the love between Bob and Tonya and felt that "[a]t some point, contact will likely resume." But "[g]iven her extreme needs and fragility, that judgment call should be made cautiously and with therapeutic oversight." Based on the record then before the court — including Tonya's age, history of abuse, the nature and severity of her behaviorial issues, her disclosures, her improvement after the visits were terminated, Michels's testimony about Tonya's anxieties, and the safety concerns about Bob — the superior court did not err in finding that denial of visitation was in Tonya's best interests.

### 2.    Active efforts

When determining whether OCS made active but unsuccessful efforts, courts may look to "the [S]tate's involvement in its entirety" and may consider "a parent's demonstrated lack of willingness to participate in treatment."[23] "Our concern is not with whether the State's efforts were ideal, but whether they crossed the threshold

---

[22]    *D.H. v. State,* 723 P.2d 1274, 1277 (Alaska 1986) (citing *In re Rhine*, 456 A.2d 608, 613 (Pa. 1983)).

[23]    *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008) (quoting *N.A. v. State, DFYS*, 19 P.3d 597, 603 (Alaska 2001)).

between passive and active efforts."[24] We conclude that the superior court did not err in finding that OCS discharged its active efforts duty under ICWA.

Because in-state providers could not help her, OCS provided out-of-state residential treatment to Tonya for nearly two years, then weekly cognitive behavioral therapy after she returned to Anchorage. OCS developed multiple case plans for Bob and referred him to parenting classes, substance abuse treatment, and UAs, adding an additional therapy program after he relapsed. Bob was provided weekly family therapy by Skype, quarterly visits, and phone calls while Tonya was in Oregon, then twice-weekly unsupervised visits and holidays in Anchorage until these visits were terminated. OCS proved to the court that this denial of visitation was in Tonya's best interests. Even then, OCS kept trying to work with Bob, but he stopped working with OCS because, by his own admission, he was "fed up." He did not comply with UAs, and even though OCS tried numerous times to contact him to set up a sex offender risk assessment over the summer, he did not begin the paperwork until November 2015 or complete it until April 2016.

OCS's efforts may not have been ideal, but the record supports that they were active. Tonya's sexualized behavior was triggered not only by Bob's visits and the FBI interviews, but also by other students engaging in attention-getting behavior. Her behaviorial issues could become so extreme that in-state providers could not treat her. Given the "devastating setback" it would be to Tonya if she were to be hospitalized even locally, we cannot fault OCS for trying to minimize the triggers within its control and develop Tonya's stability in the real world outside of a specialized residential treatment center. Bob's frustration with the situation is understandable, but as he himself admitted,

---

[24] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 272 (Alaska 2011) (citing *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 213 (Alaska 2010)).

he was the one who chose to "take a selfish negative stand towards not doing what I should be doing," disengage from OCS, and stall the progress that he could have made over the last year of this case. The superior court did not err by finding that OCS made active but unsuccessful efforts.

## C. Whether Returning Tonya To Bob's Custody Would Result In Harm

In a termination proceeding under ICWA, the court must find by "evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[25] Bob challenges both the court's qualification of Weeks as the expert in this case and the court's ultimate finding that returning Tonya to Bob would put her at risk of serious harm.

### 1. Expert witness qualification

Under ICWA, the requirements for an expert's qualifications are heightened beyond those normally required.[26] When an expert is qualified who has no knowledge of tribal customs, the expert's education and training "should constitute 'expertise beyond the normal social worker qualifications.' "[27]

Bob argues that based on her credentials, Weeks was not "a professional person having substantial education in the area of his or her specialty" as recommended

---

[25]     25 U.S.C. § 1912(f).

[26]     *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 504 (Alaska 2009).

[27]     *Id.* (quoting H.R. REP. NO. 95-1386, at 22 (1978), *as reprinted in* 1978 U.S.C.C.A.N. 7530, 7545). Bob concedes that cultural knowledge was not required in this case.

by the 1979 BIA Guidelines.[28]  But Weeks is a clinical therapist and case manager supervisor at AK Child and Family.  At the time of trial, she had "substantial education" in the area of her specialty, including a bachelor's degree in psychology, a master's degree in psychology and counseling, continuing education hours in trauma, and progress towards her doctorate in integrated mental healthcare.  Although Weeks was not yet licensed as a clinical therapist, she testified that she met all the licensure requirements and was in the process of preparing to take the exam.  She had at least eight years of experience working as a clinical therapist in outpatient and hospital settings.  We conclude that the superior court did not err in qualifying Weeks as "an expert in . . . clinical . . . and psychological treatment for children suffering from traumatic conditions" and relying on her testimony to support its ICWA finding.

### 2.    Continued custody finding

The finding that continued custody is likely to result in serious damage to the child "requires proof that the parent's conduct is unlikely to change and will likely cause serious harm to the child in the future."[29]  "These elements may be proved through the testimony of one or more expert witnesses, or by aggregating the testimony of lay and expert witnesses."[30]  "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support

---

[28]    *Id.* (citing Guidelines for State Courts; Indian Child Custody Proceedings, 44 Fed. Reg. 67,584, 67,593 (1979)).

[29]    *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013) (citing *Marcia V.*, 201 P.3d at 503).

[30]    *Id.* (citing *L.G. v. State, Dep't of Health & Soc. Servs.*, 14 P.3d 946, 950 (Alaska 2000)).

that conclusion."[31] "[T]he issues are whether the expert disregarded or was unaware of contrary evidence, and whether the testimony was so vague and generalized that the trial court clearly erred in according weight to it."[32]

Bob argues that the superior court erred by relying on Weeks's testimony because "she explicitly testified that at the time of the termination trial she was unable to offer an opinion on whether returning Tonya to Bob put her at risk of harm." But as Bob himself acknowledges, Weeks also testified that she stood by her recommendation at the 2015 visitation hearing that it was not in Tonya's interest to have contact with her father because he was a trigger for her. Bob does not point to any "contrary evidence" that Weeks "disregarded or was unaware of" between the July 2015 visitation hearing and the July 2016 termination trial, and the superior court could have concluded that little had changed in Bob's situation over the course of the year that would change Weeks's opinion. Bob was noncompliant with UAs; the court could have concluded that his substance abuse situation had not changed. Bob did not take any parenting classes other than Father's Journey, and later incidents called his parenting and supervision skills into question.

There was new information about Tonya's sexual abuse disclosures between 2015 and 2016, but Weeks was aware of it. At the 2015 visitation hearing, Weeks testified that she was concerned about Tonya's safety in part because the FBI investigation had not yet been completed. But at the 2016 termination trial, Weeks testified that the investigation was now closed and that Tonya had not made any new

---

[31]    *Id.* at 966 (quoting *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 992 (Alaska 2002)).

[32]    *Id.* (quoting *Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1020 (Alaska 2009)).

sexual abuse disclosures during the investigation. The court could have reasonably concluded that Weeks took this information into account in affirming her earlier opinion. And the court could aggregate Weeks's expert opinion with other evidence, such as the sex offender risk assessment concluding that Bob was not an appropriate parent for Tonya and lay testimony about Tonya's escalating sexualized behavior, to support its finding that Tonya would be harmed by returning to her father's custody. We conclude that the superior court did not err.

### D. Whether It Was In Tonya's Best Interest To Terminate Bob's Rights

"Before terminating parental rights to a child, the superior court must find by a preponderance of the evidence that termination is in the child's best interests."[33] The court may consider the factors in AS 47.10.088(b)[34] as well as "any other facts relating to the best interests of the child" such as "the bonding that has occurred between the child and [her] foster parents, the need for permanency, and the offending parent's lack of progress."[35] "The superior court is not required to consider or give particular weight to any specific factor, including a parent's desire to parent or [his] love for the child."[36]

Bob argues that the superior court erred because it should have granted him additional time to reestablish the parent-child bond with Tonya. But the superior court

---

[33] *Chloe W. v. State, Dep't of Health & Soc Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270-71 (Alaska 2014) (citing CINA Rule 18(c)(3)).

[34] These factors include the likelihood that the child will be returned to the parent within a reasonable time, the harm caused to the child, and the likelihood that harmful conduct will continue. AS 47.10.088(b).

[35] *Chloe W.*, 336 P.3d at 1271.

[36] *Id.* (citing *Barbara P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 234 P.3d 1245, 1263-64 (Alaska 2010)).

was entitled to consider other factors in making its finding. The court noted Bob's failure to engage in services, Michels's concern about Bob's ability to supervise his daughter, and other testimony about Tonya's behavior, reactions, and reports from her visits with her father. The court also noted Bob's poor decision-making in getting involved with a woman who posed a high risk to children despite OCS's warning that the relationship was not in Tonya's best interests. And Tonya's foster parent and her aunt both testified that they were available to adopt her. We conclude that the superior court did not err by finding that termination was in Tonya's best interests.

## V.    CONCLUSION

For the reasons explained above, we AFFIRM the superior court's order terminating the father's parental rights.