NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | |
|---|---|
| JULIO A., ) | |
| ) | Supreme Court No. S-17603 |
| Appellant, ) | |
| ) | Superior Court No. 3PA-17-00015 CN |
| v. ) | |
| ) | MEMORANDUM OPINION |
| STATE OF ALASKA, DEPARTMENT ) | AND JUDGMENT* |
| OF HEALTH & SOCIAL SERVICES, ) | |
| OFFICE OF CHILDREN'S SERVICES, ) | No. 1785 – August 5, 2020 |
| ) | |
| Appellee. ) | |
| ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Palmer, John C. Cagle, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Kimberly D. Rodgers, Assistant Attorney General, Anchorage, and Kevin G. Clarkson, Attorney General, Juneau, for Appellee. Rachel Levitt, Assistant Public Advocate, and James Stinson, Public Advocate, Anchorage, for Guardian Ad Litem.

Before: Bolger, Chief Justice, Winfree, Maassen, and Carney, Justices [Stowers, Justice, not participating].

I.     **INTRODUCTION**

A father appeals the superior court order terminating his parental rights to his daughter, an Indian child under the Indian Child Welfare Act (ICWA). We conclude

---

\*     Entered under Alaska Appellate Rule 214.

that the record contains sufficient evidence to support the superior court's challenged findings that: (1) OCS met its active efforts burden and (2) returning the daughter to the father would likely cause her serious emotional harm. We affirm the termination order.

## II.     FACTS AND PROCEEDINGS

### A.     Facts

Julio and Andrea[1] are the parents of Elyana.[2] Elyana was born in June 2011 and is an Indian child through her mother's Cherokee affiliation.[3] Julio and Andrea dated for several years and they both have children from other relationships. Julio left Andrea a few weeks before Elyana's birth and moved to Florida. Julio claimed that he moved to Florida for better job opportunities, but he was also facing arrest in Alaska for violating conditions of probation relating to his convictions in several criminal cases. Julio has never met Elyana in person.

By 2016 Andrea and Elyana were homeless. Andrea's other children were in the care of their father and their paternal grandmother, Karla. Andrea contacted Julio and asked if she and Elyana could move in with him. Julio said he would only take Elyana, and Andrea refused. She then contacted Karla, told her that she was homeless and could not care for Elyana, and asked her to take Elyana. Karla agreed, and Andrea signed a power of attorney so that Karla could obtain medical care and other services for Elyana.

---

[1]     Andrea is not participating in this appeal.

[2]     We use pseudonyms to protect the family members' privacy.

[3]     *See* 25 U.S.C. § 1903(4) (2018) (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

Nine months later in September 2016, Karla called Julio in hopes of securing his signature on guardianship paperwork for Elyana. Julio indicated that he would be willing to sign the paperwork, and Karla mailed the forms to him, including a return envelope with her mailing address. Karla, however, never received the completed paperwork from Julio, and he did not contact her again that year.

In January 2017 Karla reached out to the Office of Children's Services (OCS) because her power of attorney over Elyana was expiring and she was unable to obtain another one. OCS petitioned for, and was awarded, custody of Elyana, and she entered foster care (but remained in Karla's care) in late February 2017.

In March 2017 an OCS caseworker provided Karla's contact information to Julio so that he could have calls with Elyana. Julio did not call. Another caseworker discussed the Interstate Compact on the Placement of Children (ICPC) process with him.[4]

In April 2017 the assigned caseworker developed initial case plans for both Andrea and Julio. Julio's case plan included completing a substance abuse assessment, taking regular drug tests, attending parenting classes, contacting his caseworker monthly, and communicating with Elyana as therapeutically recommended. That same month OCS noted that paternity testing should be conducted because Julio was only listed as the father on Elyana's birth certificate through the child support agency's default process. OCS decided that Julio should send letters to Elyana because of their limited prior interactions.

Around the spring of 2017, Julio's phone was disconnected for approximately a month and a half. Julio did not attend three court hearings related to Elyana's case that were held that fall. In December a caseworker reminded Julio that he

---

[4]    Through this process, OCS would request that children's services in Florida assess the safety of Julio's home, complete a background check on Julio and his girlfriend, and identify any safety risks in the household.

should write letters to Elyana. Julio complied, but the caseworker described his letter-writing as "very sporadic."

A Florida ICPC worker wrote to Julio in February to schedule a home study. Julio did not respond. The worker subsequently called Julio four times to schedule the home study and left voicemails. After approximately a month passed with no response, the caseworker closed the request. Julio eventually did text the caseworker — from the same phone number the worker had been calling. The worker informed him that he would need to ask OCS to send the ICPC request again.

At the end of summer 2018, an OCS caseworker was able to make contact with Julio to conduct a case plan evaluation. One of his case plan goals was to be a clean and sober caregiver, but an evaluation found that Julio had made no progress on either obtaining a substance abuse assessment or attending drug testing. Julio indicated he was already completing drug testing for his employer several times a month, and OCS secured Julio's permission to get testing results from his employer. But Julio's employer did not turn over any results.

The OCS caseworker contacted four separate programs to find a parenting class that would suit Julio's work schedule and location. In October the caseworker sent Julio a referral for parenting classes. Julio indicated the referred classes were too far away, so the caseworker found a closer program. Julio attended only one class.

That same month the caseworker again sent Karla's contact information to Julio so that he could have calls with Elyana. The caseworker thought phone contact might assist Julio in developing a relationship with Elyana because he did not send her letters consistently. Elyana's therapist had recommended that any contact be consistent, but Julio did not call Elyana over the next three months.

In January 2019, because Julio had not called Elyana yet, the caseworker asked service provider Unified Families to facilitate and supervise phone contact

between the two. Although it was difficult to reach Julio initially, the caseworker was eventually able to do so, and the twice-weekly supervised phone calls began in late January 2019.

In February 2019 OCS developed an updated case plan with Julio. The caseworker also made a second ICPC request. Florida ICPC workers called Julio and left four messages on separate days. He did not respond. The Florida workers denied the request after only two weeks because it was "very unusual" not to hear from a prospective placement by that time. Two weeks later, an ICPC worker received a text from Julio's cell phone number and a call from a woman identifying herself as Julio's wife regarding the request; the worker informed them that the request had been closed and OCS would have to resend the request.

In early 2019, Julio had twice-weekly phone visitation with Elyana. The interactions on these calls were mixed. Sometimes, Elyana did not want to talk to Julio, stating that she did not want to talk because he had left her as a baby. Elyana's therapist recommended that Elyana decide whether to talk to Julio and when to end the calls so that she could maintain emotional stability. Elyana took the calls more often than not but often disconnected earlier than the allotted time. Julio missed some of the scheduled calls, which resulted in a pattern of strained communication on the subsequent calls.

### B. Proceedings

OCS filed a petition for termination of parental rights in May 2018. In September Andrea failed to appear for her trial, and her parental rights were terminated. Julio's termination trial was held over six days in April, May, and June 2019. Witnesses included a family case manager from Florida, an OCS social worker, Karla, Julio, Andrea, OCS's expert witness Jamie Browning, and Elyana's paternal aunt.

During the termination trial, Julio testified that before Elyana was born, he saw Andrea do "toxic poisonous things" to her children. Julio's testimony also indicated he was aware that Andrea was struggling with drug addiction both while he was living with her and after he left Elyana in her care in Alaska. Andrea testified that Julio left two weeks before Elyana's birth, never acted as a father to her, and did not provide any child support. She further described him as drunk and violent during the entirety of her pregnancy and recounted several incidents of him flipping her out of a recliner chair while she was pregnant. Andrea explained that although the neighbors called the police about Julio's domestic violence on multiple occasions, she lied to the police to protect Julio. She additionally testified that before leaving Alaska, Julio was arrested for driving while intoxicated and misconduct involving weapons, but he did not complete his required classes for substance abuse.

The superior court found by clear and convincing evidence that Elyana was a child in need of aid under AS 47.10.011 subsections (1) (abandonment), (6) (substantial risk of physical harm), (9) (neglect), and (10) (parental substance abuse). The court also found by clear and convincing evidence that Julio had not remedied his conduct because he did not meaningfully participate in any aspect of his case plan, specifically noting Julio failed to obtain a substance abuse assessment or attend parenting classes.

The court further found by clear and convincing evidence that OCS made active efforts to reunify the family, pointing to OCS's involvement of the Cherokee Nation (Tribe), case planning, identification of Florida providers for parenting classes and drug abuse assessments, facilitation of visitation, efforts to obtain drug testing results from Julio's employer, and two separate attempts to obtain a home study through the ICPC process. The court noted that OCS cannot be held responsible for a parent's unwillingness to engage in referred services. The superior court additionally found,

beyond a reasonable doubt, that Julio's continued custody was likely to result in serious emotional damage to Elyana. The superior court relied on expert Jaime Browning's testimony and her reports to arrive at this conclusion. Finally, the superior court found that termination of Julio's parental rights was in Elyana's best interests. Based on these findings, the superior court entered an order terminating Julio's parental rights.

Julio appeals the superior court's finding that OCS made active efforts to reunify the family. He also appeals the court's finding that Elyana would likely suffer serious harm if placed in his care.

## III. STANDARD OF REVIEW

"In child in need of aid (CINA) cases, we review the superior court's factual findings for clear error."[5] "Findings are clearly erroneous if review of the entire record leaves us with 'a definite and firm conviction that a mistake has been made.' "[6] "Whether . . . [OCS] complied with ICWA's 'active efforts' requirement and proved beyond a reasonable doubt that granting the parent custody would likely result in serious damage to the child are mixed questions of law and fact."[7] "[W]hether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules" is a question of law, which we review de novo.[8] Similarly, whether expert testimony presented at trial

---

[5] *Charles S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 442 P.3d 780, 788 (Alaska 2019).

[6] *Id.* (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[7] *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 761 (Alaska 2009) (citing *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002)).

[8] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011).

satisfies the requirements of ICWA is a legal question we review de novo.[9] "We bear in mind at all times that terminating parental rights is a drastic measure."[10]

## IV.   DISCUSSION

### A.   The Superior Court Did Not Err In Finding That OCS Made Active Efforts Toward The Reunification Of Julio And Elyana.

In the case of an Indian child, OCS must show by clear and convincing evidence that "active efforts have been made to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[11] The active efforts requirement does not require perfection, but it does require that OCS's efforts "crossed the threshold between passive and active efforts."[12] A parent's unwillingness to cooperate is relevant to determine whether OCS has met its active efforts burden.[13]

#### 1.   OCS made active efforts to prevent the breakup of the family.

The Bureau of Indian Affairs regulations define active efforts as "affirmative, active, thorough, and timely efforts intended primarily to maintain or

---

[9]   *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 502 (Alaska 2009) (citing *E.A.*, 46 P.3d at 989).

[10]   *Charles S.*, 442 P.3d at 788 (quoting *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1104 (Alaska 2011)).

[11]   CINA Rule 18(c)(3).

[12]   *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 107 (Alaska 2017) (quoting *Pravat P.*, 249 P.3d at 272).

[13]   *Pravat P.*, 249 P.3d at 271.

reunite an Indian child with his or her family."[14]   The record contains evidence supporting the superior court's finding that, over the entirety of the case, OCS made active efforts to prevent the breakup of the Indian family.  They included: (1) developing case plans and regularly reviewing Julio's progress; (2) looking for relative placements for Elyana and maintaining her placement in her community with her half-sisters and near her mother; (3) providing ways for Julio to contact Elyana, including giving him Karla's contact details twice, suggesting he write letters, and setting up supervised phone contact; (4) arranging paternity testing in Florida; (5) preparing and sending the ICPC request to Florida twice; (6) referring Julio to parenting classes and contacting substance abuse services; (7) trying to obtain Julio's drug-testing results from his employer and his probation records to assess his sobriety and modify his case plan; (8) attempting repeatedly and through different means to communicate with Julio; (9) notifying the Tribe of meetings, hearings, and case developments, and seeking the Tribe's input; and (10) visiting Elyana regularly at her foster home and school.

Julio argues that OCS's efforts to reunite him with Elyana were not thorough.  Specifically, he argues that the case planning process was deficient.  First, he notes that OCS's original plan did not identify specific providers in his city, listing "TBA through ICPC" for substance abuse treatment and only providing Alaska providers for parenting classes.  Julio argues that the case plan was not tailored to him as required by AS 47.10.086(a)(1)[15] because his most recent case plan (1) failed to identify a parenting

---

[14]    25 C.F.R. § 23.2 (2019).

[15]    In relevant part, AS 47.10.086(a) provides:

[T]he department shall make timely, reasonable efforts to provide family support services to the child and to the parents or guardian of the child that are designed to prevent

(continued...)

class provider, simply listing "TBD" under service providers and (2) failed to identify a substance abuse assessor or treatment provider (again, listed as "TBD") and placed the obligation of substance abuse testing on Julio's employer. He further argues that OCS did not meet its obligation to obtain the necessary records; and relied too heavily on the ICPC process to implement case planning.[16]

The record, however, shows that caseworkers made frequent and repeated efforts to work with Julio and to help him address his case plan, despite his lack of cooperation. For example, one caseworker planned to locate service providers for Julio through the ICPC process, but that did not happen because Julio did not respond to requests to schedule a home study. His other caseworker made efforts to identify a substance abuse assessment provider and parenting classes outside of the ICPC process.

---

[15]    (...continued)
out-of-home placement of the child or to enable the safe return of the child to the family home, when appropriate, if the child is in an out-of-home placement. The department's duty to make reasonable efforts under this subsection includes the duty to

    (1) identify family support services that will assist the parent or guardian in remedying the conduct or conditions in the home that made the child a child in need of aid[.]

[16]    In *C.J. v. State, Dep't of Health & Soc. Servs.*, involving a Florida-based father whose parental rights to his Indian children were terminated by the superior court, we determined that OCS's attempts at reunification were minimal. 18 P.3d 1214, 1219 (Alaska 2001). We noted, "It appears that the state was satisfied with allowing Florida officials to investigate the case and make reports on their efforts. It is not clear that Florida officials understood that the high standards of ICWA applied to this case or that active efforts were required." *Id.* Although Julio argues that this case supports his passive efforts argument, Julio's case is distinguishable from *C.J.* because in *C.J.* OCS depended almost entirely on Florida officials' efforts. *Id.* Because OCS's efforts in this case were not limited to the efforts of Florida caseworkers, the Florida caseworkers' knowledge of the active efforts requirement is not determinative.

The caseworker reached out to five potential providers for a local substance abuse assessment. The caseworker also talked to at least seven different providers of parenting classes and referred Julio to two programs. One program was too far away for Julio's preference and he attended just a single session of a closer referred program.

Additionally, given the fact that Julio's employer was already conducting drug testing, it was reasonable for OCS to seek results from the employer to avoid duplication of services, especially considering Julio's reluctance to go to another location for testing or to allow it to interfere with his schedule. OCS, however, was unable to receive any urinalysis or hair follicle drug testing results from Julio's employer.[17] When it was clear efforts to receive results from his employer would be unsuccessful, OCS offered to arrange for Julio to go to another testing provider, but he refused.

And even if the Florida officials were too quick to close Julio's file during the ICPC process, that does not undercut OCS's overall efforts. OCS sent the ICPC request to Florida not once, but twice. OCS's case planning and overall efforts when viewed as a whole "crossed the threshold between passive and active efforts."[18]

### 2. OCS did not fail to act in a timely manner to reunite Julio and Elyana.

Julio argues that OCS failed to act in a timely manner to reunite him with Elyana. He argues that OCS unreasonably wasted time by requiring him to prove paternity, despite being listed on Elyana's birth certificate. However, OCS's reasons for requiring paternity testing were valid: Julio told OCS in April 2017 that he questioned his paternity. And although several months passed before paternity testing was

---

[17] Julio provided OCS with a slip indicating he had passed a one-time mouth swab test for his employer.

[18] *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 107 (Alaska 2017) (quoting *Pravat P.*, 249 P.3d at 272).

completed, this delay may have been the result of poor communication, considering his phone was not in service for about a month and a half, and he failed to appear for at least one court hearing during this time.

Julio also argues that OCS failed to act in a timely manner by waiting until paternity was proven to rehabilitate his relationship with Elyana. Although OCS was not obligated to begin active efforts until paternity had been established,[19] OCS continued to assist Julio regardless, including developing and discussing his case plan with him.

### 3. OCS's active efforts are documented in detail in the record as required by ICWA.

Julio also argues that active efforts were not documented "in detail in the record" as required by ICWA.[20] In support, he cites *Bill S. v. State*, *Department of Health and Social Services, Office of Children's Services*, where we stated, "While documentation is related to OCS's duty to *make* active efforts, documenting those efforts is a separate responsibility."[21] Julio argues that OCS's failure to keep any documentation regarding the decision to "deny" all visitation for two full years of OCS custody constituted a failure to meet this responsibility.

However, the reason there is no documentation stating that Julio was banned from contacting Elyana is because OCS never made a decision to deny visitation. The lack of visitation was the result of Julio and Elyana's nonexistent relationship before Elyana entered foster care, as well as Julio's lack of cooperation with OCS's reunification efforts. The superior court was entitled to consider OCS's efforts in the

---

[19] *See T.F. v. State, Dep't of Health & Soc. Servs., Div. of Family & Youth Servs.*, 26 P.3d 1089, 1094-95 (Alaska 2001).

[20] *See* 25 C.F.R. § 23.120(b) (2019).

[21] 436 P.3d 976, 983 (Alaska 2019) (emphasis in original).

context of Julio's absences and his "demonstrated lack of willingness to participate" in the case.[22]

Soon after OCS was awarded custody, OCS provided Julio with Karla's contact information so that he could contact Elyana. Julio did not call Elyana. Shortly thereafter, OCS recommended Julio write letters to her because he had not been in touch for a year or more. Several months later, he was reminded to send letters. OCS also encouraged telephonic visitation as another way to initiate regular contact. But Julio did not call Elyana for three months after OCS again gave him her contact information; calls did not start until OCS set up supervised phone visitation. "[D]ocumentation itself is not an 'active effort,' rather it is a mechanism for OCS and the court to ensure that active efforts have been made."[23] Given Julio's inconsistent participation in the reunification process and his nonexistent relationship with Elyana prior to OCS obtaining custody, the documentation OCS provided is sufficient for this court to determine that active efforts were made.

**B.      The Superior Court Did Not Err In Determining That Placing Elyana With Julio Would Likely Result In Serious Harm To Her.**

ICWA requires the court must find beyond a reasonable doubt, based on evidence that includes testimony of a qualified expert, that placement with the parent is likely to result in serious emotional or physical damage to the child.[24] Julio argues that OCS failed to prove beyond a reasonable doubt that Elyana would likely suffer serious

---

[22]      *See Ben M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 204 P.3d 1013, 1021-22 (Alaska 2009) (finding father's long absences and failure to maintain contact with OCS showed a "demonstrated lack of willingness to participate" in OCS's efforts to reunify family).

[23]      *Bill S.*, 436 P.3d at 983.

[24]      25 U.S.C. § 1912(f) (2018); CINA Rule 18(c)(4).

harm in his care. Julio first argues that the State's expert witness, Jaime Browning, was not qualified to provide the required opinion. His second argument is that the evidence presented by OCS regarding risk of harm did not meet ICWA's reasonable doubt standard.

### 1. Browning was a qualified expert for ICWA purposes.

Julio argues that Browning was not qualified to provide the required expert testimony because she is not licensed in any state to practice social work and because she lacked experience in counseling and diagnosing children.

We previously explained "that witnesses we have considered to be *clearly* qualified under ICWA had substantial education in social work or psychology and direct experience with counseling, therapy, or conducting psychological assessments."[25]  An expert's lack of licensure is not necessarily a barrier to her qualification as an expert for ICWA purposes.[26]

We recently affirmed the superior court's determination in another case that Browning is a qualified expert in child development and child safety for ICWA purposes.[27]  Browning's experience includes over 12 years in the child protection field, including working as an OCS ICWA family services supervisor and as a caseworker in a therapeutic drug court. She also worked with adolescents as floor staff at a dual-diagnosis residential treatment center. Prior to her work at OCS, Browning worked with

---

[25]     *Eva H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 436 P.3d 1050, 1057 (Alaska 2019) (emphasis in original).

[26]     *See Bob S. v. State*, *Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 108 (Alaska 2017) (holding that unlicensed clinical therapist was qualified ICWA expert).

[27]     *Addy S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, No. S-17427, 2020 WL 915975, at \*4-5 (Alaska Feb. 26, 2020).

mentally ill individuals on community case management and medication compliance. Browning's education, training, and work experience suffice to qualify her as an expert in the areas of child safety and development.[28]

### 2. The superior court did not err in finding that Julio's continued custody of Elyana was likely to result in serious harm to her.

The finding that continued placement with the parent is likely to result in serious damage to the child "requires proof that the parent's conduct is unlikely to change and will likely cause serious harm to the child in the future."[29]

Julio argues that Browning's testimony centered on Elyana's PTSD and attachment issues that were primarily the result of her mother's care. Julio asserts that this evidence is insufficient to support a finding, beyond a reasonable doubt, that putting Elyana in his care would result in harm. However, the record as a whole, and Browning's testimony in particular, provides sufficient support for the superior court's finding.

Despite Julio's characterization of the facts, Browning unequivocally stated in her report that Elyana was at substantial risk of emotional harm if returned to her father. Browning specifically noted a connection between Elyana's lack of trust, violent behavior, and insecure attachments with caretakers and her lack of relationship with her father.[30] Browning testified how Julio's absence and her mother's drug addiction

---

[28] *Id.* at \*5.

[29] *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013) (citing *Marcia V. v. State, Office of Children's Servs.*, 201 P.3d 496, 503 (Alaska 2009)).

[30] Browning wrote that Elyana "continues to demonstrate anxiety through controlling circumstances, lack of trust, aggression, violence, abandonment and general family discord . . . . These themes demonstrated are consistent with the evidence that
(continued...)

affected Elyana's ability to form secure familial attachments. She also described Elyana's significant anxiety regarding having to live with her father because they have not established a "parent/child relationship." Browning noted her concerns about the minimal actions Julio had taken to be available for Elyana, specifically discussing his repeated failure to follow through with the ICPC process.

The record supports that Julio's efforts to communicate with Elyana were limited and inconsistent, despite her emotional need for consistency. Julio also abandoned Elyana in Andrea's care and made no effort to contact her for years, despite his awareness of Andrea's debilitating drug use and abusive treatment of her other children.

The record, including Browning's testimony, provides clear support for the superior court's determination that placement with Julio was likely to result in serious emotional or physical damage to Elyana.

## V.    CONCLUSION

The superior court's order is AFFIRMED.

---

[30]    (...continued) demonstrates the role [Julio] has had in his daughter's life and the trauma she has experienced . . . ."