*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| DEMETRIA H., | ) | |
| | ) | Supreme Court No. S-16826 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-15-00679 CN |
| v. | ) | |
| | ) | O P I N I O N |
| STATE OF ALASKA, DEPARTMENT | ) | |
| OF HEALTH & SOCIAL SERVICES, | ) | |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | No. 7308 – October 5, 2018 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Andrew Guidi, Judge.

Appearances: Olena Kalytiak Davis, Anchorage, for Appellant. Joanne M. Grace, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Stowers, Chief Justice, Winfree, Maassen, Bolger, and Carney, Justices.

CARNEY, Justice.

## I. INTRODUCTION

A mother appeals the termination of her parental rights to her son, an Indian

child. She argues the trial court violated the Indian Child Welfare Act (ICWA)[1] by finding that the Office of Children's Services (OCS) made active efforts and that her continued custody of her son was likely to result in serious emotional or physical damage to him. She also argues that the trial court's latter finding was not supported by the testimony of a qualified expert as required by ICWA. We affirm the trial court's order terminating her parental rights because its findings satisfy ICWA's requirements.

## II. FACTS AND PROCEEDINGS

Demetria H. is the mother of seven-year-old Dion,[2] who is an Indian child as defined by ICWA.[3] Demetria is a member of an Indian tribe and Dion is eligible for membership in the Native Village of Yakutat Tlingit.[4] Demetria also has a 16-year-old daughter, Dasia, who is a member of Chickaloon Native Village. Although OCS had custody of both children early in this case, Dasia was released from custody and returned to Demetria in December 2015 after refusing OCS services and running away from her foster home. OCS filed a motion to release Dasia from custody in January 2017. As a result, Demetria's parental rights to her were not terminated.

### A. First Removal

Dion was first in OCS custody from approximately June 2013 to June 2015.

---

[1] 25 U.S.C. §§ 1901-1963 (2012). ICWA establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." 25 U.S.C. § 1902.

[2] Pseudonyms are used to protect the family's privacy.

[3] *See* 25 U.S.C. § 1903(4).

[4] *Id.* (" 'Indian child' means any unmarried person who is under age eighteen and is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.").

Demetria had asked OCS to take custody of Dion because she was homeless and unable to care for a toddler. He was placed in three foster homes during that time. Dasia was in a residential treatment program during the same period.

OCS attempted to work with Demetria to develop a case plan, but she did not attend any scheduled meetings from July to September or respond to OCS's attempts to contact her. OCS finalized her case plan in September without her input. The case plan required Demetria to maintain stable housing, attend therapy, participate in parenting classes, participate in a urinalysis program, and maintain contact with Dion.

From January to June 2014 Demetria had little contact with her caseworker despite OCS's attempts to contact her to update the case plan. In March 2014 the OCS caseworker updated the case plan to include that Demetria complete a substance abuse assessment and comply with its recommendations, and sent a letter to the Alaska Housing Finance Corporation (AHFC) to assist her in getting housing.

In June 2014, before Dasia's scheduled release from treatment, the caseworker met with her. Dasia reported that in the past Demetria had frequently been intoxicated and left Dion in Dasia's care. She said that she had once tried to suffocate Dion because she was jealous he got so much of their mother's attention.

After Dasia was discharged from residential treatment in July 2014, OCS filed a non-emergency petition seeking legal custody of Dasia but allowed her to remain with her mother. Demetria had not actively participated in Dasia's treatment while she was in the residential facility and did not follow through with outpatient services after Dasia was discharged.

By late June 2014 Dion had been moved to a third foster home because the second one was no longer willing to care for him due to his treatment of the family's pets and other children. About the same time, OCS began allowing Demetria five-hour unsupervised visits with Dion in her home.

The home visits went well. Demetria was living in an apartment she had obtained after OCS's referral to AHFC, and she had made progress on her case plan. OCS released custody of both children to Demetria on June 10, 2015.

## B.    Second Removal

In October OCS learned that Dasia had suffered a drug overdose; Demetria became angry and "stormed out" of an OCS meeting arranged a few days later to address Dasia's overdose and other family issues. When Dasia arrived at the hospital following her overdose, she threatened to kill herself. Hospital staff reported that Demetria did not take her daughter's threat of suicide seriously and did not believe that Dasia needed mental health treatment. The staff also reported that Demetria was aggressive toward them and had to be restrained and escorted out of the hospital after assaulting security guards.

OCS took emergency custody of both Dasia and Dion, and filed an emergency petition on October 10, 2015. OCS's petition alleged that the children were in need of aid on a number of grounds,[5] including that Demetria was in a relationship with a sex offender. OCS placed Dion back in his most recent foster home while Dasia initially remained at Alaska Psychiatric Institute. She was later moved to the same foster home as Dion.

A probable cause hearing was originally scheduled two days later, but it was continued to November because Demetria did not attend and was not yet represented. The court made provisional findings that placement of Dion and Dasia with

---

[5]    AS 47.10.011 sets forth 12 grounds on which a child may be determined to be in need of aid. The emergency petition alleged sections (6) (physical harm), (7) (sexual abuse or risk of sexual abuse), (8) (mental injury or risk of mental injury), (9) (neglect), (11) (parental mental illness), and (12) (child has committed illegal act).

Demetria was contrary to the children's welfare for the reasons alleged in the emergency petition and granted OCS temporary custody through the next hearing.

Following the temporary custody hearing in November the court issued a second temporary custody order, finding that active efforts had been made to reunify the Indian family and that there was good cause to deviate from ICWA's placement preferences because the removal was an emergency and the children were placed together. The court found the children were in need of aid but did not specify a subsection of AS 47.10.011.

Also in November Dasia ran away from her foster home. Demetria helped locate Dasia and OCS permitted Dasia to stay with Demetria on a trial home visit. OCS also created a new case plan. In addition to maintaining all of the same requirements as the earlier case plan, the new one required Demetria to complete a mental health evaluation and its recommendations, demonstrate impulse control, and assist Dasia in accessing substance abuse treatment.

In a March 2016 adjudication hearing Demetria stipulated that both of her children were in need of aid based on neglect.[6] She also stipulated that active efforts had been made and that there was good cause to deviate from the ICWA placement preferences because there were no ICWA-compliant placements available when the children were removed. Finally she stipulated to temporary OCS custody of both children, and OCS agreed to allow Dasia to remain living with Demetria, while Dion remained in the foster home.

In May 2016 OCS filed a predisposition report summarizing what had occurred since OCS took custody. The report outlined that Dasia was not attending school and that in the months leading up to the report she had been hospitalized three

---

[6]     *See* AS 47.10.011(9).

times due to overdosing on synthetic marijuana (spice), blacking out from alcohol, and attempting suicide. The report stated that Dion had an Individualized Education Plan (IEP) at school due to his speech and social development delays and that he had to have two teeth pulled due to severe tooth decay. The disposition hearing was held in June, but the court was unable to make active efforts findings because Demetria was not being allowed to visit Dion. The court therefore did not make any disposition findings, instead saying that it would continue the disposition hearing as to Dion and enter disposition findings at the next hearing.

Demetria worked with OCS throughout 2016, attending meetings in January, February, March, April, July, August, October, and November, and making some progress on her case plan. In October 2016 the court held a permanency hearing. OCS requested that the court adopt its recommended goals of guardianship for Dasia and adoption for Dion.[7] OCS asked the court to find that Demetria had not substantially complied with her case plan. In December 2016 OCS filed a petition to terminate Demetria's parental rights to Dion.[8]

In January 2017 Demetria refused to complete a mental health assessment for an individual therapy referral or to sign a release of information so OCS could confirm her participation in a different individual therapy program. OCS also filed a motion requesting permission to release Dasia from custody because she was unwilling to receive services. OCS continued meeting with Demetria through January 2017.

---

[7] OCS initially considered Dion's foster home to be a preadoptive placement. Dion was still in the same home at the time of trial, but the foster parent was no longer willing to adopt him.

[8] OCS alleged Dion was a child in need of aid under AS 47.10.011(1) (abandonment), (6) (physical harm), (7) (sexual abuse or risk of sexual abuse), (8) (mental injury or risk of mental injury), (9) (neglect), (10) (parental substance abuse), and (11) (parental mental illness).

### C.    Termination Trial

In May and June 2017 the court held a three-day termination trial.  A representative from Yakutat Tlingit, Dion's tribe, attended by telephone starting on the second day of the trial.  Although OCS had notified Yakutat Tlingit of the case in October 2015, the tribe did not move to intervene until after the termination trial.  The court, however, allowed its representative to participate in the trial and to question witnesses.

OCS called 11 witnesses, including two Anchorage police officers regarding incidents involving Demetria and Dasia, and a security guard from the Anchorage transit center regarding incidents involving the family there.  In addition a number of professionals who had worked with the family testified:  Dasia's counselor, Dion's kindergarten teacher, Dion's former foster parent, Dion's therapist, two OCS caseworkers, and an OCS visitation supervisor.  To satisfy ICWA's requirement of expert testimony, OCS presented the testimony of Philip Kaufman.[9]

Dion's psychologist, Dr. Courtney Horwath-Oliver, testified that she had diagnosed him with post-traumatic stress disorder (PTSD) and disinhibited social engagement disorder (DSED).  The PTSD diagnosis was based on Dion's sleep problems, nightmares, hypersensitivity to touch and noise, and increased negative emotional states, which she attributed to past traumatic experiences.  She testified that DSED is a form of attachment disorder characterized by the child "seeking out and initiating contact with unfamiliar adults" and having "experienced a pattern of extreme

---

[9]    25 U.S.C. § 1912(f) (2012) (requiring termination of parental rights to be supported by evidence beyond a reasonable doubt including testimony of a qualified expert that continued custody of the child by the parent is likely to lead to serious emotional or physical damage to the child).

insufficient caregiving." Dr. Horwath-Oliver testified that because of his DSED, Dion lacks instincts of "stranger danger" which creates a high risk that he would become a victim unless he had proper adult supervision. She testified that his conditions impair his ability to function — including being successful in school and making friends. She testified that Dion should continue in therapy to address his attachment disorder and help him avoid future problems such as being unable to regulate his emotions, form meaningful attachments with people, have peer relationships, or have intimate relationships as an adult.

The trial court allowed Philip Kaufman to testify as OCS's ICWA expert over Demetria's objection. Kaufman is a licensed social worker who previously worked for OCS and is a former police officer; he has a bachelor's degree in elementary education and psychology, a master's degree in social work, and a master's degree in public administration. He testified that he has completed training in substance abuse and its impact on Alaska Natives and American Indians, domestic violence, and ICWA. He had previously been qualified as an expert in child welfare cases. The Yakutat Tlingit representative approved of his testifying as an ICWA expert.

Kaufman reviewed the family's records provided by OCS and prepared an expert report to the court. He identified several safety threats for the children. He testified that Demetria did not control her alcohol use; exposed the children to individuals who present risks to them; and struggled to provide stability, food, clothing, and shelter. He also testified that Demetria had not appropriately addressed Dasia's medical needs. And he testified that based on Demetria's failure to help Dasia get mental health treatment or to participate in Dasia's therapy, she was unlikely to follow through with Dion's therapy. Kaufman concluded that, in light of Dion's special needs,

Demetria's continued custody of Dion was likely to result in serious and substantial physical or emotional harm to Dion.

At the close of trial OCS urged the court to terminate Demetria's parental rights to Dion due to her abandonment, neglect, and substance abuse.[10] OCS filed proposed findings of fact; Demetria did not object to any of them or file her own proposed findings. In September 2017 the trial court issued a written order terminating Demetria's parental rights to Dion and largely adopting OCS's proposed findings.

The court found by clear and convincing evidence that Dion was a child in need of aid under AS 47.10.011(9) (neglect) and (10) (parental substance abuse) and that Demetria had not remedied the conduct or conditions that put him at substantial risk of harm. It also found clear and convincing evidence that active efforts had been made to prevent the breakup of the family. It based this finding on OCS's multiple case plans; its attempts to assist Demetria to get into individual therapy; and its referrals to parenting classes, substance abuse assessments, housing assistance, drug testing, and mental health assessments. The court found that Demetria had refused to participate in substance abuse treatment, to address her own mental health needs, and to take the necessary steps to secure housing for herself and her children.

Finally, in part based on Kaufman's testimony, the court found evidence beyond a reasonable doubt that Demetria's continued custody of Dion was likely to result in serious emotional or physical damage to Dion. It relied on Kaufman's testimony that Demetria lacked protective capacity and refused to address risks to her children. It found by a preponderance of the evidence that Dion's best interests would be promoted by terminating Demetria's parental rights.

---

[10]    AS 47.10.011(1) (abandonment), (9) (neglect), (10) (substance abuse). OCS did not ask the court to rule on any of the other grounds alleged in the petition.

Demetria appeals.

## III.   STANDARD OF REVIEW

"We review de novo whether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules."[11]

"We review a superior court's findings of fact for clear error."[12] "A trial court's determination that a parent's continued custody of a child will likely result in the child suffering serious emotional or physical damage is a factual finding that we review for clear error."[13]

"A trial court's decision to admit expert testimony is reviewed for an abuse of discretion."[14] But "[w]hether expert testimony presented at trial satisfies the requirements of ICWA is a legal question that we review de novo."[15]

"Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[16] "Whether 'the trial court's active efforts finding failed to comport with ICWA's requirements' is a question of law reviewed de novo."[17]

---

[11]   *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 270 (Alaska 2011) (quoting *Dale H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 235 P.3d 203, 210 (Alaska 2010)).

[12]   *Id.* at 269 (quoting *Dale H.*, 235 P.3d at 209).

[13]   *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013).

[14]   *Id.*

[15]   *Id.*

[16]   *Pravat P.*, 249 P.3d at 270 (quoting *Dale H.*, 235 P.3d at 210).

[17]   *Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 348-49 (Alaska 2016) (quoting *Sandy B. v. State, Dep't of Health*
(continued...)

## IV. DISCUSSION

Demetria argues that the trial court's order did not comply with the requirements of ICWA, that the court erred in finding OCS made active efforts to prevent the breakup of her family, that the evidence did not support the trial court's finding that her ongoing custody of her son would result in a substantial risk of harm to him, and that the trial court's order was not supported by the testimony of a qualified expert. We disagree: the court's order complied with ICWA's requirements.

Because OCS filed its petition to terminate parental rights on December 19, 2016, this case is governed by the new ICWA regulations issued by the Bureau of Indian Affairs (BIA) in 2016.[18] BIA has also issued interpretative guidelines for these regulations.[19] The guidelines are not binding but in the past we have turned to them for guidance in interpreting ICWA.[20]

### A. The Trial Court Did Not Err In Finding OCS Made Active But Unsuccessful Efforts To Prevent The Breakup Of This Indian Family.

To terminate parental rights to an Indian child, the trial court must find by

---

[17] (...continued)
*& Soc. Servs., Office of Children's Servs.*, 216 P.3d 1180, 1186 (Alaska 2009)).

[18] ICWA Regulations, 25 C.F.R. § 23.143 (2016). "[T]he provisions of this subpart apply to any subsequent proceeding in the same matter or subsequent proceedings affecting the custody or placement of the same child [initiated after December 12, 2016]." *Id.* The changes made by the regulations do not affect the outcome of this case, but because Demetria refers to the regulations and guidelines in her briefing, they are discussed when relevant to her arguments.

[19] BUREAU OF INDIAN AFFAIRS, GUIDELINES FOR IMPLEMENTING THE INDIAN CHILD WELFARE ACT 4 (Dec. 2016), https://www.bia.gov/sites/bia.gov/files/assets/bia/ois/pdf/idc2-056831.pdf.

[20] *See David S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 270 P.3d 767, 781-82 (Alaska 2012).

clear and convincing evidence that OCS has made active efforts "to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family and that these efforts have proved unsuccessful."[21]

Demetria argues OCS did not make active efforts because it failed to involve Dion's tribe in his case, address her need for housing, or permit her to participate in Dion's therapy, and was merely passive in its efforts to assist her. She claims that under the recently amended ICWA regulations such failures preclude a finding of active efforts.

Under the now-applicable 2016 ICWA regulations "active efforts" is defined as "affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family."[22] One regulation provides examples of what constitutes active efforts:

> Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. To the maximum extent possible, active efforts should be provided in a manner consistent with the prevailing social and cultural conditions and way of life of the Indian child's Tribe and should be conducted in partnership with the . . . Tribe.[23]

OCS properly notified Yakutat Tlingit of the proceedings; the tribe did not participate

---

[21]    *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 760-61 (Alaska 2009) (quoting 25 U.S.C. § 1912(d) (2012); CINA Rule 18(c)(2)(B)).

[22]    25 C.F.R. § 23.2.

[23]    *Id.*

until the termination trial.[24] Contrary to Demetria's argument, the tribe's decision not to participate until trial does not mean that OCS failed to comply with the regulation's exhortation to work in partnership with Dion's tribe or to make active efforts.

Demetria next focuses on her lack of housing to argue that OCS failed to provide active efforts. After first taking custody of the children, OCS released them back to Demetria when she obtained an apartment with its help. OCS was never able to determine how or why Demetria had lost her apartment. Throughout the period leading up to the termination trial OCS continued to identify possible housing options and offer to assist Demetria to apply for them. The trial court therefore appropriately considered OCS's efforts to help Demetria obtain housing as part of its active efforts finding.[25]

Demetria also argues that refusing to allow her to participate in Dion's therapy demonstrates that OCS failed to make active efforts. But Dion's therapist stated that it would not be in Dion's best interest to include anyone in his therapy who would not consistently participate. And although she testified that it would help Dion to have his caregiver involved in his therapy, it would only be beneficial to involve a consistent primary caregiver. She testified that until there was a specific plan for Dion to return to his mother's custody it would not have been appropriate to involve Demetria in his

---

[24]     We note that Dasia's tribe, Native Village of Chickaloon, was involved throughout the time that Dasia was in OCS custody.

[25]     Demetria also argues that OCS's efforts were insufficient because they did not address her poverty, homelessness, or unemployment. But OCS has discretion to prioritize which services should be provided to a parent based upon the issues identified in her case. *See Denny M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 365 P.3d 345, 351 n.22 (Alaska 2016). And Demetria's parental rights were terminated because of her neglect of Dion and her substance abuse. OCS's efforts were targeted at addressing these issues.

therapy. Furthermore Demetria had refused to participate in her own substance abuse and mental health treatment, and had demonstrated in the past that she was unwilling to help her children obtain mental health services. It was not inappropriate for OCS to rely on Dion's therapist's recommendation to involve only a consistent caregiver.

Although Demetria argues that OCS's efforts were more passive than active, our previous cases have affirmed findings that OCS made active efforts in similar circumstances. For example, in *Pravat P. v. State, Department of Health & Social Services, Office of Children's Services* we held that a similarly long list of referrals and encouragement supported a finding of active efforts.[26] During the four years that OCS worked with Demetria's family, it created numerous case plans and tried to engage Demetria in following them. It provided referrals for parenting classes, substance abuse and mental health assessments and services, and housing. Demetria elected not to attend meetings and not to follow through on the referrals.

Demetria urges us to use the opportunity presented by the new regulations to examine more closely OCS's duty to make active efforts because "an uncompromising standard holds true in every Alaska [CINA] case: even if the outlook is bleak and likelihood of success is low."[27] OCS responds that the court should consider "a parent's demonstrated lack of willingness to participate in treatment"[28] when making its active

---

[26] *See* 249 P.3d 264, 271-72 (Alaska 2011); *see also Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013) (describing OCS's provision of multiple case plans, multiple referrals, and regular family contact as abundant support for an active efforts finding).

[27] *Kylie L. v State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 407 P.3d 442, 452-53 (Alaska 2017) (examining the effort required from OCS under the less stringent "reasonable efforts" standard applied in non-ICWA cases).

[28] *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*,
(continued...)

efforts finding. In *A.M. v. State* we noted that we had "never suggested that the scope of the State's duty to make active remedial efforts should be affected by a parent's motivation or prognosis before remedial efforts have commenced."[29] But we have also affirmed trial courts' findings of active efforts when it has become clear that *further* efforts by OCS would be futile.[30] Both parties take positions consistent with our holding in previous cases: in each case the trial court must make its determination based upon the evidence presented. "What constitutes sufficient 'active efforts' will vary from case-to-case, and courts have the discretion to consider the facts and circumstances of the particular case before it when determining whether the definition of 'active efforts' is met."[31]

The trial court's finding of active efforts, under both the previous guidelines and the current regulations, turns on OCS's efforts.[32] In this case, OCS repeatedly referred Demetria to substance abuse assessments that she did not take advantage of; as

---

[28]      (...continued)
400 P.3d 99, 107 (Alaska 2017) (quoting *Maisy W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 175 P.3d 1263, 1268 (Alaska 2008)).

[29]      891 P.2d 815, 827 (Alaska 1995).

[30]      *See, e.g., Wilson W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008) (approving trial court's conclusion that OCS did not need to make further active efforts following father's detailed threats to kill any social worker that set foot on his property).

[31]      BUREAU OF INDIAN AFFAIRS, *supra* note 19, at 55; *see also Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 554-55 (Alaska 2017).

[32]      25 C.F.R. § 23.2 (2016).

a result OCS did not continue to make the same referrals again and again.[33] The trial court appropriately considered these facts in reaching its conclusion that OCS had made active efforts to reunite Demetria's family and that the services and referrals it provided met its burden to provide active efforts. Thus, the trial court did not err in finding that active efforts were made.

**B.    The Trial Court Did Not Err In Finding That Demetria's Continued Custody Would Likely Result In Dion Suffering Serious Emotional Or Physical Harm.**

Demetria argues that the termination of her parental rights is not supported by evidence beyond a reasonable doubt that her continued custody of Dion would likely result in a substantial risk of harm to him. To terminate parental rights the trial court must find "by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent . . . [was] likely to result in serious emotional or physical damage to the child."[34] Demetria argues that there was no causal relationship between her conduct and the alleged risks to Dion. She also argues that Dion's removal was based on her poverty and homelessness. But evidence at trial showed that Dion was removed and Demetria's parental rights were terminated because of her neglect of Dion and her substance abuse.

The evidence at the termination trial demonstrated that Dion's DSED was linked to Demetria's neglect and substance abuse. The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* specifies criteria

---

[33]    Had Demetria later demonstrated an interest in obtaining a substance abuse assessment OCS could have again been required to make referrals on her behalf.

[34]    *Sylvia L. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.* 343 P.3d 425, 431 (Alaska 2015) (omission in original) (quoting 25 U.S.C. § 1912(f) (2012); CINA Rule 18(c)(4)).

for a clinician to diagnose a child with DSED.[35] The first criterion is "[a] pattern of behavior in which a child actively approaches and interacts with unfamiliar adults."[36] The diagnosis also requires the mental health professional to find that the child has "experienced a pattern of extremes of insufficient care" as evidenced by at least one of a list of several criteria.[37] The first two examples in the list are: "1. Social neglect or deprivation in the form of persistent lack of having basic emotional needs for comfort, stimulation, and affection met by caregiving adults," and "2. Repeated changes of primary caregivers that limit opportunities to form stable attachments (e.g., frequent changes in foster care)."[38] Dion's therapist testified that children meet these diagnostic criteria when their "basic emotional or physical needs [are] not being met continuously" and when they have "frequent change[s] in primary caregivers." The evidence demonstrated that Dion had experienced both of these listed situations. In addition Dion's therapist testified that his PTSD was the result of his traumatic experiences during his infancy and early childhood. She suggested Dion's diagnoses could be related to neglect, witnessing his mother being arrested, times when he and Demetria were homeless, periods when Demetria was suffering from substance abuse problems, and when he was often left with strangers. Finally Dr. Horwath-Oliver testified that Dion would need stability in order to benefit from treatment for his PTSD and DSED.

In addition Kaufman offered his expert opinion that Demetria's own substance abuse and possible mental illness were linked to her lack of protective capacity

---

[35] AM. PSYCHIATRIC ASS'N, DIAGNOSTIC & STATISTICAL MANUAL OF MENTAL DISORDERS 268 (5th ed. 2013).

[36] *Id.*

[37] *Id.*

[38] *Id.*

and neglect of Dion, and contributed to his mental health problems. And Kaufman noted that Dion had spent two-thirds of his life in OCS custody. Significant evidence demonstrated that Dion's DSED put him at risk of being victimized, of further delays in school, of an inability to make friends, and of being unable to regulate his emotions or form meaningful attachments with others.

The court found that Demetria's substance abuse and mental health issues were linked to her neglect of Dion. And the court specifically connected its finding of neglect to Demetria's exposing Dion to sex offenders, failing to adequately supervise him, and failing to take parental responsibility for him, including not feeding or bathing him.

Demetria further argues that releasing Dasia from custody and returning her to Demetria demonstrates that she should have also been considered a safe placement for Dion. But this argument ignores the fact that Dasia, who is nearly 17, refused to cooperate with OCS and ran away from foster care, and Dion, who is 7, has special needs and remains in a foster home. OCS's decision not to petition for termination of Demetria's rights to Dasia, or even to seek continued custody of Dasia, has no bearing on the risks of harm to Dion.

The trial court did not err in finding that there was evidence beyond a reasonable doubt that Demetria's continued custody of Dion was likely to result in serious harm to Dion.

## C.    The Trial Court Did Not Err By Qualifying The ICWA Expert.

Demetria argues that Kaufman did not satisfy ICWA's requirements for an expert witness.[39] She argues that he had insufficient specific knowledge of Yakutat Tlingit culture and was unqualified because he had not met her or Dion.

---

[39]    *See* 25 U.S.C. § 1912(f).

ICWA requires that a court's finding of substantial risk of harm be supported by qualified expert testimony.[40] This finding "may be proved through the testimony of one or more expert witnesses, or by aggregating the testimony of lay and expert witnesses."[41] And "ICWA does not require that the experts' testimony provide the sole basis for the court's conclusion; ICWA simply requires that the testimony support that conclusion."[42]

> According to the ICWA regulations:
>
> A qualified expert witness must be qualified to testify regarding whether the child's continued custody by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child and should be qualified to testify as to the prevailing social and cultural standards of the Indian child's Tribe. A person may be designated by the Indian child's Tribe as being qualified to testify to the prevailing social and cultural standards of the Indian child's Tribe.[43]

The Yakutat Tlingit tribal representative who participated in the termination trial explicitly accepted Kaufman as an appropriate expert witness. Thus, the trial court did not err in qualifying Kaufman as an ICWA expert.

The guidelines do recommend that the qualified expert witness be familiar with the particular child.[44] However, neither ICWA itself nor the new regulations

---

[40] *Id.*

[41] *Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 108 (Alaska 2017) (quoting *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 964 (Alaska 2013)).

[42] *Id.* (quoting *Thea G.*, 291 P.3d at 966).

[43] 25 C.F.R. §23.122(a) (2016).

[44] BUREAU OF INDIAN AFFAIRS, *supra* note 19, at 55.

require such familiarity. We have previously held that a qualified ICWA expert does not need to have met with the family so long as the court has sufficient information with regard to the particular circumstances of the family.[45] The court may obtain such information from the evidence presented, including the testimony of both the expert witnesses and lay witnesses familiar with the family.[46] Although Kaufman did not meet with Demetria or Dion, he had reviewed OCS's records.

In addition to Kaufman's expert testimony, the court had before it the testimony of other witnesses, including mental health professionals and other professionals who had worked closely with both Demetria and Dion. The trial court was permitted to aggregate Kaufman's testimony with the evidence received from other witnesses.[47]

The trial court did not err in qualifying Kaufman as an expert witness or using his testimony to support its substantial risk of harm finding.[48]

## V.    CONCLUSION

We AFFIRM the trial court's order terminating Demetria's parental rights, as it complies with the requirements of ICWA.

---

[45]    *Thea G.*, 291 P.3d at 965.

[46]    *See Bob S.*, 400 P.3d at 108-09.

[47]    *See id.*

[48]    *See* 25 U.S.C. § 1912(f); *Thea G.*, 291 P.3d at 964.