NOTICE

*Memorandum decisions of this court do not create legal precedent. A party wishing to cite such a decision in a brief or at oral argument should review Alaska Appellate Rule 214(d).*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| JULIAN F., | ) | |
| | ) | Supreme Court No. S-17060 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-16-00453/ |
| v. | ) | 00454 CN |
| | ) | |
| STATE OF ALASKA, DEPARTMENT | ) | MEMORANDUM OPINION |
| OF HEALTH AND SOCIAL SERVICES,) | | AND JUDGMENT* |
| OFFICE OF CHILDREN'S SERVICES, | ) | |
| | ) | No. 1714 – March 6, 2019 |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Gregory Miller, Judge.

Appearances: Callie Patton Kim, Assistant Public Defender, and Quinlan Steiner, Public Defender, Anchorage, for Appellant. Anna Jay, Assistant Attorney General, Anchorage, and Jahna Lindemuth, Attorney General, Juneau, for Appellee.

Before: Bolger, Chief Justice, Winfree, Stowers, Maassen, and Carney, Justices.

## I. INTRODUCTION

A father appeals the termination of his parental rights with respect to his

---

\*        Entered under Alaska Appellate Rule 214.

two children, who are Indian children.[1] He first argues that the superior court violated ICWA by finding that the Office of Children's Services (OCS) made active efforts to reunify his family.[2] Second, he argues that the record does not support the superior court's finding beyond a reasonable doubt that returning the children to him was likely to result in serious physical or emotional damage to them.[3] Because we conclude that the superior court's findings are supported by the record and meet ICWA's requirements, we affirm its order terminating the father's parental rights.

## II. FACTS AND PROCEEDINGS

Julian F. and Allison C. are the parents of five-year-old Bethany and four-year-old Cassidy.[4] Both children are Indian children within the meaning of ICWA.[5]

In August 2016 the children were living with Allison; Julian was incarcerated. In mid-August OCS filed a non-emergency petition to adjudicate the children as in need of aid and remove them from Allison's custody based on a report that

---

[1]     *See* 25 U.S.C. § 1903(4) (2012) (defining "Indian child"). The Indian Child Welfare Act (ICWA) establishes "minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture." *Id.* § 1902; *see id.* §§ 1901-1963.

[2]     *Id.* § 1912(d) (requiring any party seeking to terminate parental rights to an Indian child to demonstrate "that active efforts have been made to provide" services designed to prevent family breakup and that such efforts were unsuccessful).

[3]     *Id.* §1912(f) (requiring "evidence beyond a reasonable doubt . . . that the continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child" before a court may terminate parental rights).

[4]     We adopt the pseudonyms used by the parties to protect the family members' privacy.

[5]     *Id.* § 1903(4).

she was under the influence of drugs while caring for them.[6] Following an initial probable cause hearing that same month, which Julian attended by telephone from the correctional center[7] and Allison did not attend, OCS removed the children from Allison's home and placed them with their maternal great-grandmother.

Julian remained in jail and then in a halfway house until March 2017. He participated by telephone in hearings held during this time, including a temporary custody hearing in September 2016, a conference in October at which he stipulated to adjudication of the children as in need of aid, and a disposition hearing in January 2017.[8] Julian testified at the disposition hearing that he had participated in substance abuse counseling, parenting classes, and vocational training programs available to him in jail. The court's disposition order found that the children continued to be in need of aid and that OCS was making active efforts to prevent family breakup by arranging visitation, drafting case plans, and encouraging Julian's participation in the Department of Corrections' (DOC) programs.

When Julian was released on parole in March 2017, his case plan required him to "[f]ollow up with aftercare" for substance abuse, complete drug testing, and apply for housing. But he did not contact the OCS case worker, pick up a housing application, or follow up with substance abuse aftercare for several months. He did initially visit the children regularly at their great-grandmother's house, but stopped doing so in May 2017.

---

[6]    Child in Need of Aid (CINA) Rule 7(a). OCS alleged the children were "in need of aid as to the father due to his incarceration" and "as to the mother due to her drug addiction." *See* AS 47.10.011(2), (10).

[7]    *See* CINA Rule 3(g)(1) (allowing participation by telephone in CINA hearings).

[8]    *See* CINA Rules 10 (temporary custody), 15 (adjudication), 17 (disposition).

He later resumed visiting through OCS, but "he was taken off the calendar because he had three no-shows in a row." In July 2017 he failed to report for a required meeting with his parole officer, and he was arrested in August on an outstanding parole warrant.

Neither Julian nor Allison attended a permanency hearing held in July 2017.[9] Julian's attorney reported having had no contact with him for about six months. In its report to the court, OCS stated that its "attempts to locate and work with [him]" were of "no avail." The superior court found that OCS had made active efforts to provide services to the family, which included: referring the parents for substance abuse assessments, treatment, and random drug testing; facilitating participation in parenting classes and visitation; and developing and updating case plans. The court found that OCS's efforts had been unsuccessful. In October 2017 OCS petitioned to terminate both parents' parental rights.

Julian eventually re-established contact with the OCS case worker in late 2017. He admitted that he had relapsed on methamphetamine, and the case worker referred him for random urinalysis (UA) testing. His contact with OCS over the following months was inconsistent, and he failed to keep all but one of his UA appointments. Neither he nor Allison attended a trial setting conference in November.

A termination trial was set for March 2018. A few weeks prior to trial, Julian told the case worker that he had started a treatment program to address his drug addiction and planned to enroll in trade school. But he did not provide documentation of treatment, and by the time of trial he had yet to start school.

Neither parent attended the termination trial. The court denied their attorneys' requests for a continuance. An OCS case worker and the children's great-

---

   [9]   *See* CINA Rule 17.2 (requiring permanency hearing to be held within certain deadlines and establishing procedural requirements for hearings).

grandmother both testified to Julian's inconsistent contact and sporadic family visits. OCS also presented testimony from a licensed social worker with expertise in working with Alaska Native families.[10] The expert opined that because of Julian's history of sporadic engagement with OCS and service providers, primarily due to his frequent incarceration and his absconding from parole supervision, it was too soon to know whether the treatment program would allow him to overcome his substance abuse.

The court ordered the termination of Julian's and Allison's parental rights in late March 2018. The court found clear and convincing evidence that the children were in need of aid due to parental neglect and substance use that substantially impaired Julian's and Allison's ability to parent the children.[11] The court also found clear and convincing evidence that the parents had failed to remedy these problems within a reasonable time[12] and that OCS had made "active and reasonable efforts . . . to provide remedial services and rehabilitative programs" to facilitate reunification.[13] Relying on the expert's testimony, the court found beyond a reasonable doubt that continued custody by either parent was likely to result in serious emotional or physical damage to the children.[14] The court also found by a preponderance of the evidence that terminating parental rights was in the children's best interests.[15]

---

[10]    *See* 25 U.S.C. § 1912(f) (requiring that termination of parental rights be supported by testimony from qualified expert witness).

[11]    AS 47.10.011(9)-(10); *see* AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[12]    *See* AS 47.10.088(a)(2); CINA Rule 18(c)(1)(A)(i)-(ii).

[13]    *See* AS 47.10.088(a)(3); CINA Rule 18(c)(2)(B); 25 U.S.C. § 1912(d).

[14]    *See* 25 U.S.C. § 1912(f); CINA Rule 18(c)(4).

[15]    *See* CINA Rule 18(c)(3); AS 47.10.088(b)-(c).

Julian appeals. Allison does not appeal the termination of her parental rights.

## III. STANDARD OF REVIEW

In ICWA cases we review a superior court's findings of fact, including findings underlying a determination that returning the children to the parent would likely harm them, for clear error.[16] Factual findings are clearly erroneous if, upon review of the entire record, we are left with "a definite and firm conviction that a mistake has been made."[17] "[W]hether a superior court's findings satisfy the requirements of the CINA and ICWA statutes and rules" is a question of law that we review de novo.[18] "Whether OCS made active efforts as required by ICWA is a mixed question of law and fact."[19]

## IV. DISCUSSION

A trial court's decision to terminate parental rights to an Indian child is governed by both state and federal statutes and rules.[20] Under Alaska law, a court may not terminate parental rights unless it finds by clear and convincing evidence that: (1) the child is "in need of aid" as a result of conduct or conditions described in

---

[16] *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 269-70 (Alaska 2011). Julian urges us to clarify the standard of review that applies to a determination that OCS has shown beyond a reasonable doubt that returning the children to the parent is likely to cause them serious harm. For the reasons discussed below, we decline to do so in this case.

[17] *Caitlyn E. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 399 P.3d 646, 654 (Alaska 2017) (quoting *Sherman B. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 290 P.3d 421, 427-28 (Alaska 2012)).

[18] *Diego K. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 411 P.3d 622, 627 (Alaska 2018) (quoting *Pravat P.*, 249 P.3d at 269).

[19] *Caitlyn E.*, 399 P.3d at 654 (quoting *Pravat P.*, 249 P.3d at 270).

[20] *See* AS 47.10.005-.990; 25 U.S.C. §§ 1901-1963.

AS 47.10.011;[21] (2) the parent has either not remedied the conditions that present a substantial risk of harm to the child or has not made sufficient progress in remedying them;[22] and (3) OCS made reasonable efforts under AS 47.10.086 to provide services aimed at reunifying the family.[23]  The court must also find by a preponderance of the evidence that termination of parental rights is in the best interests of the child.[24]

ICWA imposes additional requirements under federal law.  It requires that OCS make "active efforts . . . to provide remedial services and rehabilitative programs designed to prevent the breakup of the Indian family" and that OCS show that these efforts were unsuccessful before a court can order termination of parental rights to an Indian child.[25]  The court must also find, beyond a reasonable doubt and based on evidence that includes qualified expert testimony, that returning the child to the parent will likely "result in serious emotional or physical damage to the child."[26]

Julian argues that the superior court erred first by finding that OCS complied with ICWA's active efforts requirement, and second by finding that his continued custody of the children would likely result in serious emotional or physical harm to them.[27]

---

[21]      AS 47.10.088(a)(1); CINA Rule 18(c)(1)(A).

[22]      AS 47.10.088(a)(2)(A)-(B); CINA Rule 18(c)(1)(A)(i)-(ii).

[23]      AS 47.10.088(a)(3); CINA Rule 18(c)(2)(A).

[24]      CINA Rule 18(c)(3); *see also* AS 47.10.088(b)-(c).

[25]      25 U.S.C. § 1912(d).

[26]      25 U.S.C. § 1912(f).

[27]      OCS's brief also asks us to address Julian's attorney's request that the court "delay the effect of its decision" for six months to allow Julian more time to complete

(continued...)

**A.    The Superior Court Did Not Err When It Found That OCS Made Active Efforts To Prevent The Breakup Of The Family.**

Julian relies on the Bureau of Indian Affairs' (BIA) 2016 regulations implementing ICWA's active efforts requirement to argue that OCS did not do enough to connect him with remedial and rehabilitative services.[28]  He contends that the OCS case worker should have done more to help him enroll in substance abuse treatment before or soon after his release, especially given his willingness while in jail to work on his case plan.  He also argues that the superior court's active efforts findings do not provide enough detail to support meaningful appellate review.  OCS responds that the active efforts requirement depends on the circumstances of the case, including the parent's willingness to participate in a case plan.  OCS argues it was Julian's "pattern of disengagement" that "thwarted" OCS's efforts to reunify the family.

Section 23.2 of the BIA's 2016 regulations provides:

> Active efforts means affirmative, active, thorough, and timely efforts intended primarily to maintain or reunite an Indian child with his or her family.  Where an agency is involved in the child-custody proceeding, active efforts must involve assisting the parent or parents or Indian custodian through the steps of a case plan and with accessing or developing the resources necessary to satisfy the case plan. . . .  [A]ctive efforts should be provided in a manner consistent with the

---

[27]    (...continued) treatment and trade school; OCS argues that the court did not abuse its discretion by denying this request.  Because Julian does not appeal this denial, we do not address this argument.

[28]    *See* 25 C.F.R. § 23.2 (2016).  The regulations govern any ICWA custody proceeding initiated after December 12, 2016, and therefore apply to the termination petition and order in this case.  25 C.F.R. § 23.143; *see also* 25 C.F.R. §§ 23.1-.144; Indian Child Welfare Act Proceedings, 81 Fed. Reg. 38778 (June 14, 2016).

> prevailing social and cultural conditions and way of life of the Indian child's Tribe . . . .[29]

The regulations require active efforts to be "documented in detail in the record"[30] and "tailored to the facts and circumstances of the case."[31]

A trial court's active efforts finding "turns on OCS's efforts."[32] Thus, a parent's unwillingness or apparent inability to work on a case plan "before remedial efforts have commenced" does not relieve OCS of its duty to make active efforts, but we may affirm an active efforts finding when it is "clear that *further* efforts by OCS would be futile."[33] OCS's efforts must be "active" but need not be "ideal,"[34] and we consider those efforts in their entirety on review.[35] We have affirmed findings of active efforts in cases where OCS made multiple case plans, provided multiple referrals for substance abuse treatment and other services, and arranged visitation and family contact.[36] A

---

[29] 25 C.F.R. § 23.2.

[30] *Id.* § 23.120(b).

[31] *Id.* § 23.2.

[32] *Demetria H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1064, 1072 (Alaska 2018).

[33] *Id.* (emphasis in original) (first quoting *A.M. v. State*, 891 P.2d 815, 827 (Alaska 1995); then citing *Wilson W. v. State, Office of Children's Servs.*, 185 P.3d 94, 101 (Alaska 2008)).

[34] *See Bob S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 400 P.3d 99, 107 (Alaska 2017).

[35] *See Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 556 (Alaska 2017) (citing *Jon S. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 212 P.3d 756, 763-64 (Alaska 2009)).

[36] *See, e.g., Bob S.*, 400 P.3d at 107 (affirming active efforts finding where
(continued...)

parent's disengagement may "excuse minor faults in OCS's efforts."[37] When parents have failed to attend scheduled visits,[38] refused to participate in therapy,[39] stopped working with OCS,[40] or declined to follow up on referrals for substance abuse assessments,[41] we have considered their conduct in evaluating a finding that OCS made active but unsuccessful efforts.

---

[36]     (...continued)
OCS developed multiple case plans; referred father to parenting classes, substance abuse treatment, UAs, and therapy; and provided regular visitation until visits were determined not to be in child's best interests); *Thea G. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 291 P.3d 957, 962 (Alaska 2013) (affirming active efforts finding where OCS provided "multiple case plans; multiple referrals for substance abuse evaluations and support for treatment programs; multiple referrals for mental health evaluations and counseling; medical, dental, and mental health services for the children; regular family contact . . . ; and a trial home visit"); *Pravat P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 249 P.3d 264, 271-72 (Alaska 2011) (affirming active efforts finding where OCS had arranged visitation, encouraged completion of emotional management and parenting classes, and attempted to overcome cultural and linguistic barriers by providing interpreters and locating resources within father's ethnic and religious communities).

[37]     *Pravat P.*, 249 P.3d at 272.

[38]     *See id.*

[39]     *See id.* (noting that father refused therapy after OCS attempted to find culturally sensitive therapist).

[40]     *See Bob S.*, 400 P.3d at 107 (finding that father's disengagement with OCS lent support to active efforts finding despite noting that father's "frustration with the situation [was] understandable").

[41]     *See Demetria H. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 433 P.3d 1064, 1071-72 (Alaska 2018).

Here, there is evidence to support the superior court's ultimate finding that OCS attempted to work with Julian and that its attempts "prove[d] unsuccessful."[42] The record shows that OCS referred Julian for drug testing, attempted more than once to provide him with housing applications, arranged visitation both while he was incarcerated and after his release, and made at least four unsuccessful attempts to contact him after he got out of jail. Additionally, we consider the programs offered by DOC — which included substance abuse counseling, parenting classes, and reentry classes — when reviewing OCS's efforts.[43] Taken together, these efforts are certainly not ideal, but they go beyond merely passive.[44]

Julian argues that OCS nevertheless fell short because it "failed to adequately address [his] real problem: substance abuse." He implies that, under the BIA regulations, it was not enough for the OCS case worker to remind him of the need to take the steps necessary to "follow up with aftercare" as part of his case plan. Rather, he

---

[42]     We remind trial courts of the need to make findings adequate to support meaningful appellate review. *See, e.g.*, *Borchgrevink v. Borchgrevink*, 941 P.2d 132, 139 (Alaska 1997). The superior court's oral findings, while sparse, focused on OCS's efforts and Julian's missed court appearances, failure to avail himself of "the services offered," and lack of documentation of his treatment program. The court's written decision simply signed — without modification or notation — OCS's proposed "Findings, Conclusions, and Order Terminating Parental Rights and Responsibilities." The OCS form listed the families' names and recited the statutory requirements, but provided no additional detail specific to this case. It is only because the oral findings provide sufficient indication of the basis for the court's decision that we are able to review the superior court's decision.

[43]     *See Jude M. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 394 P.3d 543, 556-57 (Alaska 2017) (considering both programs offered to parent during incarceration and OCS's efforts after release when reviewing active efforts finding).

[44]     *See Bob S.*, 400 P.3d at 107.

contends, she should have helped him "develop the resources to succeed by arranging and paying for an assessment and transportation . . . or enrolling him in a treatment program."[45]  Although it does not appear that OCS offered to schedule appointments for Julian, provide transportation, or enroll him in treatment, Julian discounts the effect of his avoiding contact with OCS after he was released from DOC custody.

OCS's efforts to assist a parent must be "affirmative, active, thorough, and timely," but BIA regulations do not prevent the court from considering a parent's lack of participation when determining whether OCS's efforts were active even though unsuccessful.[46]  Julian failed to attend scheduled visits for months at a time and missed the majority of his scheduled UAs.  He repeatedly failed to report for required meetings with his parole officer and was rearrested for absconding from parole in August 2017.  He attended none of the court hearings held after his release.  And even after he re-contacted the OCS case worker in October 2017, he missed at least two case planning meetings and one family contact appointment.  It was therefore not clear error for the superior court to find that the OCS worker had made adequate active efforts to contact and work with Julian, and that these efforts had not succeeded.

Considering OCS's efforts in their entirety, we conclude that there is clear support in the record for finding that OCS undertook more than merely "passive" efforts to reunify the family.  The superior court therefore did not err when it found that OCS satisfied ICWA's active efforts requirement.

---

[45]  *See* 25 C.F.R. § 23.2.

[46]  25 C.F.R. § 23.2; *see also Demetria H.*, 433 P.3d at 1072 (affirming active efforts finding under 2016 BIA regulations in part because parent "elected not to attend meetings and not to follow through on [OCS's] referrals").

**B.    The Superior Court Did Not Err When It Found Beyond A Reasonable Doubt That Returning The Children To Julian Would Likely Result In Serious Harm To Them.**

Section 1912(f) of ICWA provides that a court may terminate parental rights to an Indian child only if it finds beyond a reasonable doubt that "continued custody of the child by the parent . . . is likely to result in serious emotional or physical damage to the child."[47] Julian argues that the evidence was insufficient to support such a finding. He points out that there was no evidence that he ever used drugs in the children's presence or home or that he was under the influence while visiting them. He contends that it was therefore improper for the court to find that placing the children with him would put them at risk of being exposed to drugs or cared for by a parent under the influence. He also argues that the evidence does not show beyond a reasonable doubt that he was unlikely to change his conduct because, at the time of trial, he had enrolled in a treatment program and was taking steps to enroll in school.

**1.    We decline to revisit the standard of review.**

Julian points out that our recent cases — and the parties' briefs — articulate inconsistent standards of review for a trial court's determination that returning a child to the parent will likely result in serious harm to the child. Julian urges us to affirm the hybrid standard stated in *Jon S. v. State, Department of Health & Social Services, Office of Children's Services*: "Whether substantial evidence supports the court's findings that the state . . . proved beyond a reasonable doubt that granting the parent custody would likely result in serious damage to the child [is a] mixed question[] of law and fact."[48] But

---

[47]    25 U.S.C. § 1912(f).

[48]    212 P.3d 756, 761 (Alaska 2009) (citing *E.A. v. State, Div. of Family & Youth Servs.*, 46 P.3d 986, 989 (Alaska 2002)); *accord Diana P. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 355 P.3d 541, 546 (Alaska 2015).

OCS's brief cites *Thea G. v. State, Department of Health & Social Services, Office of Children's Services*: "A trial court's determination that a parent's continued custody of a child will likely result in the child suffering serious emotional or physical damage is a factual finding that [this court] review[s] for clear error."[49] (Alteration in original.)

We acknowledge that these cases appear to diverge on whether a determination of likely serious harm to the child is a purely factual question — which would be reviewed for clear error — or a mixed question of fact and law — where we would review factual findings for clear error but apply our independent judgment to decide whether those findings satisfied ICWA's evidentiary requirement. But because we would not reverse the superior court's decision under either formulation of the standard of review, as we discuss below, we decline to revisit it in this case.

### 2. The record supports the superior court's determination that returning the children to Julian was likely to result in serious harm to them.

We apply a two-prong test to determine whether continued custody is likely to result in serious harm to the child.[50] OCS must prove that "(1) the parent's conduct is likely to harm the child and (2) the parent's conduct is unlikely to change."[51] A risk of serious harm "can be proved through the testimony of a single expert witness, by

---

[49] 291 P.3d 957, 962 (Alaska 2013) (citing *Christina J. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 254 P.3d 1095, 1103-04 (Alaska 2011)).

[50] *Diana P.*, 355 P.3d at 546.

[51] *Id.*

aggregating the testimony of expert witnesses, or by aggregating the testimony of expert and lay witnesses."[52]

In this case the superior court appeared to rely substantially on the testimony of the ICWA expert to determine that OCS met its burden. Julian contends that the expert's testimony mainly addressed the risks the children would face from "proximity exposure" to drugs and from being cared for by an intoxicated parent. He argues that the court's conclusions based on this testimony should apply only to Allison, not to him, since there was no evidence that he ever exposed his children to drugs or was intoxicated in their presence.

But the expert's testimony about Julian supports the court's determination in this case. She testified to his long history of substance abuse and noted that, while he had spent limited periods of time "engaged in services and doing quite well," these periods had repeatedly ended in Julian relapsing, being arrested, or absconding from probation or parole. As a result she believed it was "too . . . premature to know [whether] the [the treatment program was] going to do anything long-term" to address Julian's drug addiction. She stated that the risks to the children were not limited to exposure to drugs but also included "concerns about attachment . . . because of the parents' inconsistent family contact, attendance and engagement."

The record also shows that Julian was absent from large portions of his children's lives because he was incarcerated, more than once for offenses involving controlled substances. Because of his repeated incarceration, it does not appear that he had physical custody of the children at any time after their birth. This pattern continued after his release in March 2017: he evidently both relapsed and served time for a parole

---

**52** *Id.* (quoting *Chloe W. v. State, Dep't of Health & Soc. Servs., Office of Children's Servs.*, 336 P.3d 1258, 1270 (Alaska 2014)).

violation during the pendency of this case. At no point since the start of OCS's involvement with the family does it appear that Julian had stable housing where the children might have been able to live with him. And he did not attend any of the CINA proceedings after his release, including the termination trial.

Given the expert's testimony and the extensive evidence that Julian's history of addiction and incarceration caused him to be absent for much of his children's lives, we conclude that the record establishes beyond a reasonable doubt that returning the children to Julian would put them at risk of serious harm. We need not decide whether this finding and the associated requirement that it be proved beyond a reasonable doubt should be treated on review as a purely factual finding or a mixed question of law and fact. In either case, the evidence here was sufficient to support the superior court's determination that granting Julian custody of the children was likely to result in serious harm to them; we therefore conclude that the superior court did not err.

## V.    CONCLUSION

Because we conclude that the superior court did not err, either by finding that OCS satisfied ICWA's active efforts requirement or by determining that giving Julian custody of the children was likely to result in significant emotional or physical damage to them, we AFFIRM the superior court's termination of his parental rights.